430 So.2d 673 (1983)
Donna Susan Barnhill FREEMAN, Plaintiff-Appellant,
v.
Robert Kay FREEMAN, Defendant-Appellee.
No. 15174-CA.
Court of Appeal of Louisiana, Second Circuit.
March 28, 1983.
Writ Denied June 10, 1983.
*674 McLeod, Verlander & Dollar by Robert P. McLeod, Monroe, for plaintiff-appellant.
Farrar & Jefferson by Stephen A. Jefferson, Monroe, for defendant-appellee.
Before PRICE, HALL and SEXTON, JJ.
HALL, Judge.
Plaintiff, Susan Barnhill Freeman, appeals the judgment of the trial court rejecting her demands to be recognized as the owner of an undivided one-half interest in and for a partition of property allegedly belonging to the community of acquets and gains formerly existing between her and her former husband, Robert K. Freeman, or allegedly owned in indivision by the parties.
Mr. and Mrs. Freeman were married in 1966. They were judicially separated in September 1972, and about six months later they reconciled and resumed the marital relationship. However, Mr. and Mrs. Freeman did not execute the authentic act reestablishing the community required by LSA-C.C. Art. 155 as then written. The parties again separated in January 1980 and were divorced on May 29 of that year.
On June 26, 1980 Mrs. Freeman filed a petition for partition of the property acquired by the parties between 1972 and their divorce, particularly the family home, stock in the corporate business conducted by Mr. Freeman, an oil and gas lease, life insurance policies, bank accounts, and miscellaneous movable property. Mr. Freeman filed exceptions of no cause and no right of action claiming that the 1972 separation judgment terminated the community between himself and his wife and that the community had never been reestablished in *675 accordance with law after the parties' reconciliation. The trial judge overruled these exceptions and the case proceeded to a trial on the merits which resulted in the judgment complained of.
On appeal Mrs. Freeman contends the trial court erred in not finding her to be the owner of a one-half interest in the property mentioned above. She offers several possible theories in support of her claim, all of which will be discussed below. Mr. Freeman's contention before this court is that the parties had no community property in 1972 when they first separated, and because the community was never reestablished in accordance with Article 155, the parties remained separate in property until their divorce and Mrs. Freeman did not acquire any ownership interest in the property acquired by her husband after 1972. For the reasons set forth in this opinion, which are substantially the same reasons set forth in the able trial court's written reasons for judgment, we find it necessary to affirm the judgment in favor of defendant in spite of the apparent equities in favor of the plaintiff.
The evidence, virtually undisputed, focuses on two items of property of significant value which were acquired during the marriage after the parties' reconciliation, the stock in the corporate business operated by Mr. Freeman and the family home.
In late 1974 or early 1975 Mr. Freeman was working for his father who was the sole owner of the stock of Freeman Chemical and Cementing Company, Inc., an oil well service business. Freeman had the opportunity to buy his father's interest in the business and attempted to obtain financing from several banks and other sources, all of which turned him down because he had insufficient collateral with which to secure a loan for the $30,000 purchase price of the stock in the company. Freeman asked his wife to ask her father, D.V. Barnhill, to arrange financing for the purchase, which she did. After some discussion, Mr. Barnhill agreed to help with the financing of the purchase of the stock which was to be acquired equally by Freeman and Mrs. Freeman's brother, Joe Barnhill. A $30,000 loan was obtained from Mr. Barnhill's bank and the corporation's note for the loan amount was endorsed by D.V. Barnhill, Joe Barnhill, and Mr. Freeman. A mortgage on Mr. Barnhill's home property was pledged as collateral to secure the payment of the note. Mr. Barnhill also made cash loans to the corporation of $17,000 during 1975 for initial operating expenses of the corporation. All of the indebtedness was eventually repaid as the company prospered.
Mr. Freeman's father endorsed the corporation stock in favor of Mr. Freeman but no new stock certificates were issued in the names of the new purchasers. The company did business as B & F Cementing Company, a shell corporation formed to indicate Joe Barnhill's participation in the business. This corporation was later liquidated.
In 1978 Freeman Chemical and Cementing Company, Inc. redeemed Joe Barnhill's 75 shares of stock for a cash consideration of $90,000 paid by the corporation. A noncompetition agreement was executed by Joe Barnhill for an additional consideration of $60,000. In 1979 Freeman created another corporation, Bulk Cement, Inc., and some of the assets of Freeman Chemical and Cementing Company, Inc. were transferred to the new corporation for business reasons. Freeman is president of both corporations and from time to time has personally guaranteed substantial bank loans to the corporations. The business has prospered since Freeman took it over, has produced substantial income which provided the parties' living expenses during their marriage, and the business has a substantial net worth.
Both Mr. and Mrs. Freeman testified that at the time the corporate stock was acquired they were unaware of the legal requirement that an authentic act be executed in order to reestablish the community and they both assumed there was a community existing between them, that the stock was community property, and that Mrs. Freeman had an interest in the stock. Mrs. Freeman worked for a short time for the corporation in a secretarial capacity, but there is no indication in the evidence that *676 she ever took any active role in the business activities or did any other acts indicative of stock ownership.
In 1973, shortly after their reconciliation, the Freemans purchased a modest home in Huntington Park Subdivision, the consideration being $753 cash and the assumption of a $27,000 mortgage. The property was purchased in the names of both parties. In December 1975 a lot in Pecan Bayou Subdivision was purchased for $12,000 in the name of Mr. Freeman alone. A new home was built on this lot with Mrs. Freeman being primarily responsible for the building of the house, i.e., supervising the activities of architects, contractors, and workmen. A loan of $60,000 was obtained from the Monroe Building & Loan Association and both Mr. and Mrs. Freeman signed the mortgage to the building and loan company. The Huntington Park property was sold for $3,351 cash and the assumption of the mortgage by the purchasers. The Freemans lived in the new home until their separation in 1980.
According to Mr. Freeman's candid testimony he first became aware of the fact that there was no community existing between him and his wife when his lawyer advised him of that fact at the time he was purchasing the lot on which the family home was to be built. He purposely, in order to avoid his wife having an interest in the property, instructed the lawyer to make the deed out in his name alone. It was not until two or three years later that Mr. Freeman told Mrs. Freeman about the community property situation and took the position with her that she did not own any interest in the corporate business or the home.
Under Civil Code Article 155,[1] and the reported cases interpreting the article, it is firmly established that a judgment of separation terminates the community of acquets and gains between a husband and wife, and upon reconciliation of the spouses, reestablishment of the community was possible before January 1, 1980 only by execution of an authentic act recorded in the conveyance records of the parish where the couple was domiciled and after January 1, 1980 by a matrimonial agreement. Strict compliance with this article is required. Austin v. Succession of Austin, 225 La. 449, *677 73 So.2d 312 (1954); Cotton v. Wright, 214 La. 169, 36 So.2d 713 (1948); Efferson v. Efferson, 394 So.2d 1294 (La.App. 1st Cir. 1981); Harang v. Harang, 317 So.2d 289 (La.App. 1st Cir.1975); Corkern v. Corkern, 270 So.2d 209 (La.App. 1st Cir.1972); Jarreau v. Succession of Jarreau, 268 So.2d 101 (La.App. 1st Cir.1972); Maloney v. Maloney, 197 So.2d 131 (La.App. 4th Cir.1967). See also Succession of Griffin, 398 So.2d 1179 (La.App. 2d Cir.1981). In each of the cited cases in which an act reestablishing the community was not executed after a judgment of separation and reconciliation, the claim of a spouse to an interest in property acquired by the other spouse after the reconciliation was rejected.
In the face of this positive law and authority contrary to her position, plaintiff makes several arguments in support of her claim to an undivided one-half interest in the property acquired in her husband's name after they reconciled following a judicial separation.
Plaintiff-appellant argues that it was the mutual intent and presumption of both parties that they acquire joint ownership of the stock of Freeman Chemical and Cementing Company, Inc., and that it does not matter that they may have erroneously assumed that such joint interest was vested in them by virtue of the law of community property. Plaintiff's counsel points to the fact that it was plaintiff who arranged the financing from her father which made the purchase of the stock in the corporation possible, that the father would not have provided the financing except for the fact that he thought that his daughter would have an interest in the stock, and that both plaintiff and defendant were of the belief at the time the stock was acquired that it would be community property and that the wife would have a one-half interest in the stock.
We know of no law which would prohibit a husband and wife, separate in property, from acquiring ownership of shares of corporate stock jointly, that is, as owners of an undivided interest each in the shares of stock of the corporation. However, the evidence in this case does not support a finding that it was the mutual intent of Mr. and Mrs. Freeman that they each acquire an undivided one-half interest in the Freeman Chemical and Cementing Company, Inc., stock. The evidence is that the stock was acquired by Mr. Freeman. It was acquired from Mr. Freeman's father who endorsed the stock certificates to Mr. Freeman. It was Mr. Freeman, not Mrs. Freeman, who signed the note evidencing the loan made by the bank for the purchase of the stock. Mr. Freeman conducted the business, made the decisions, and took the actions indicative of stock ownership. Mrs. Freeman performed no acts indicative of stock ownership. Mr. Freeman, and not Mrs. Freeman, guaranteed sizeable bank loans to the corporation. The stock was clearly purchased and owned by Mr. Freeman and the mutual error on their part was as to the legal effect of his ownership. At the time the stock was acquired and for some time thereafter both parties believed that there was a community existing between them, that the stock was community property, and that Mrs. Freeman had a one-half community interest in the stock. Their erroneous belief as to the effect of the ownership of the stock by Mr. Freeman cannot have the effect of characterizing the stock as community property contrary to positive law, nor can it have the effect of vesting Mrs. Freeman with ownership of an undivided one-half interest in the stock. An error of law can never be alleged as the means of acquiring property. LSA-C.C. Art. 1846.
Appellant next contends that the community was properly reestablished in accordance with Article 155 by the parties' execution of the authentic act of mortgage of the family home to the building and loan company, which mortgage recited the parties' marital status as husband and wife. This contention is without merit. The authentic act of mortgage does not mention reestablishment of the community. The authentic act required by Article 155 is one in which the parties clearly intend to reestablish the community. In Austin v. Succession *678 of Austin, supra, the court held that the community can be reestablished only in conformity with Article 155, and "it must be done with the forms and solemnities of the law as [the article] has prescribed." In Maloney v. Maloney, supra, the court rejected an argument similar to the one made in this case, holding that the fact that the parties executed authentic acts describing their marital status and in which the wife appeared to waive homestead exemption rights had no effect on the status of the property.
Plaintiff next contends that if the community of acquets and gains between the parties was not reestablished, she nevertheless owns a one-half interest in the property by virtue of a joint venture agreement between herself and her husband. A similar contention was rejected by the court in Corkern v. Corkern, supra. Joint ventures are governed generally by the laws applicable to partnerships. Marine Services, Inc. v. A-1 Industries, Inc., 355 So.2d 625 (La. App. 4th Cir.1978); American Fidelity Fire Ins. Co. v. Atkison, 420 So.2d 691 (La.App. 2d Cir.1982). A partnership is a synallagmatic and commutative contract and can only be created by the consent of the parties. LSA-C.C. Arts. 2801 and 2805. The evidence in this case does not establish that Mr. and Mrs. Freeman agreed or consented to engage in a partnership or joint venture. Furthermore, such an agreement or contract between the spouses was prohibited by LSA-C.C. Art. 1790,[2] as it read prior to its amendment by Act 627 of 1978 which never became effective and Act 711 of 1979, which repealed Act 627 of 1978 and became effective January 1, 1980.
Plaintiff argues that the incapacity of a husband and wife to contract with each other was eliminated by the amendments to Article 1790,[3] and by the positive provisions of new Article 2329, added by Act 709 of 1979, which provides that spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy. Plaintiff cites comment (a) following Article 2329 which provides:
"(a) Spouses are free to contract with each other during marriage as to all matters that are not prohibited by public policy. For example, they may sell or lease property to each other; they may enter into a compromise agreement; they may even employ each other. The incapacities based on marital status, contained in Article 1790 of the 1870 Code, have been removed. See Acts 1979, No. 711, § 1."
Plaintiff urges that the removal of the incapacity to contract should be applied retroactively to spouses who had entered into contracts with each other prior to January 1, 1980, the effective date of the amendments to the Civil Code, so as to give effect to and ratify such contracts.
The amendments to the Civil Code cannot be given such retroactive effect. Acts 709 and 711 of 1979 contain no provisions expressly providing for or indicating such retroactive effect. Act 627 of 1978, § 9, contains transitional or retroactivity provisions which might or might not be applicable to *679 the joint venture agreement alleged to exist in this case, but that act was repealed in its entirety by Act 711 of 1979 and the latter act does not contain the provisions contained in the 1978 act. Contracts between husband and wife made in contravention of the former prohibition under Article 1790 were relative nullities and subject to ratification after the disability ceased. See King v. King, 390 So.2d 250 (La.App. 3d Cir. 1980); Monk v. Monk, 376 So.2d 552 (La. App. 3d Cir.1979). Obviously, had a joint venture agreement existed between the parties to this case it was not ratified by the parties between the January 1, 1980 effective date of the legislative removal of the disability and January 25, 1980 when the divorce action was filed by Mrs. Freeman. Absent ratification by the parties, any agreement which may have existed was not ipso facto and retroactively ratified by the legislative removal of the incapacity of a husband and wife to contract with each other.
Appellant also contends that the community between herself and her husband was reestablished by operation of law as a result of the passage of Act 709 of 1979 because the Legislature intended to impose the new legal regime on reconciled spouses who failed to reestablish the community in accordance with the provisions of Civil Code Article 155 prior to January 1, 1980. In support of this argument appellant cites Samuel, The Retroactivity Provisions of Louisiana's Equal Management Law: Interpretation and Constitutionality, 39 La.L. Rev. 347 at pp. 405-407. In discussing Act 627 of 1978, Professor Samuel concluded that a court may with some justification conclude that the equal management law established a new community regime for reconciled spouses whose community had been dissolved by separation judgment, but only to the extent that to do so would not reclassify assets already acquired. It was not suggested by Professor Samuel that the new law might have the effect of reestablishing the community retroactive to the date of the separation judgment so as to reclassify property acquired after the separation judgment and prior to the effective date of the new law. As previously discussed, there is no indication in Act 709 of 1979 that any such retroactive effect was intended. To the contrary, Section 11 of Act 709 provides that "Spouses living under a regime of separation of property shall continue to do so subject to the provisions of this Act." It would be constitutionally impermissible to allow retrospective application of legislation to impair the obligation of contracts validly entered into prior to the enactment of such legislation or to impair vested rights, such as ownership, acquired prior to the enactment of the legislation. Fontenot v. Young, 128 La. 20, 54 So. 408 (1911). Even if the community was reestablished as of January 1, 1980 this fact would not alter the classification of the property acquired prior to that date, and appellant's contention in this regard is without merit.
Appellant's next contention is that the judgment of the district court allows Mr. Freeman to be unjustly enriched at the expense of Mrs. Freeman and that he should be estopped under principles of equity from denying her ownership interest in the property, citing LSA-C.C. Art. 1965. Substantially identical arguments were rejected in the Austin and Jarreau cases. In Austin the court held:
"Where parties marry according to the forms and solemnities of the law and where their rights are settled by the express provisions of the Code, there can be no appeal to equity, which is no more or no less than `an appeal * * * to * * reason * * * where positive law is silent.' Article 21 of the LSA-Civil Code....
"It is further contended, in the alternative, that Mrs. Austin is entitled to the ownership of one undivided one-half of the property on the quantum meruit basis. There is no proof of this verbal contract between the plaintiff and her late husband, and we know of no law where a wife may recover from the estate of her deceased husband on a quantum meruit basis."
In the Jarreau case the court held:
"The same argument made by appellant herein on equitable principles was *680 considered and rejected in Austin v. Succession of Austin, above. The cited authority explicitly held that where the rights of married persons are provided for by express law, equity may not intervene. This result is compatible with LSA-C.C. art. 21, which specifically states that equity may be invoked only in those instances where the law is silent."
Further, title to property cannot be established by estoppel; "One can never be divested of title except in the manner prescribed by law, such as by deed, inheritance or prescription." Hardaway v. Martin, 401 So.2d 465 (La.App. 2d Cir.1981).
Finally, appellant argues that Article 155 is unconstitutional in that it unreasonably discriminates against married women in violation of Article 1, § 3 of the 1974 Louisiana Constitution. It is argued that since the husband is ordinarily the dominant spouse in business knowledge and experience and is the spouse who ordinarily carries on the business affairs including the acquisition of property, the wife is at a distinct disadvantage upon reconciliation after a separation judgment in negotiating an agreement to reestablish the community and in obtaining an ownership interest in property acquired as the result of the joint efforts of the spouses. Article 155 is not gender based, applies equally to both husband and wife, and is not unconstitutional.
Accordingly, for the reasons expressed herein the judgment of the district court rejecting Mrs. Freeman's demands is affirmed at appellant's costs.
Affirmed.
NOTES
[1] In 1972 and 1973 when the parties were judicially separated and then reconciled, Article 155 provided:

"The judgment of separation from bed and board carries with it the separation of goods and effects and is retroactive to the date on which the petition for same was filed, but such retroactive effect shall be without prejudice (a) to the liability of the community for the attorneys' fees and costs incurred by the wife in the action in which the judgment is rendered, or (b) to rights validly acquired in the interim between commencement of the action and recordation of the judgment. Upon reconciliation of the spouses, the community may be re-established by husband and wife jointly, as of the date of the filing of the suit for separation from bed and board, by an act before a notary and two witnesses, which act shall be recorded in the conveyance office of the parish where said parties are domiciled, but which act shall be without prejudice to rights validly acquired in the interim between rendition of the judgment and recordation of the act of reconciliation."
After amendment effective January 1, 1980, Article 155 provides:
"The judgment of separation from bed and board carries with it the separation of goods and effects and is retroactive to the date on which the original petition was filed in the action in which the judgment is rendered, but such retroactive effect shall be without prejudice (a) to the liability of the community for the attorney fees and costs incurred by the spouses in the action in which the judgment is rendered, or (b) to rights validly acquired in the interim between commencement of the action and recordation of the judgment. Upon reconciliation of the spouses, the community may be re-established by matrimonial agreement, as of the date of filing of the original petition in the action in which the judgment was rendered."
It is significant that in spite of criticism of the requirement of a formal act reestablishing the community which has resulted in apparent inequities where the spouses were unaware of the requirement, the Legislature has not seen fit to change the requirement. The requirement of a formal act was continued in the comprehensive revision of marital laws by the provision of Article 155 that the community may be reestablished by a matrimonial agreement, and the provision of Article 2331 that a matrimonial agreement must be "an act under private signature duly acknowledged by the spouses."
[2] Article 1790 prior to the 1980 amendment provided:

"Besides the general incapacity which persons of certain descriptions are under, there are others applicable only to certain contracts, either in relation to the parties, such as a husband and wife, tutor and ward, whose contracts with each other are forbidden; or in relation to the subject of the contract, such as purchases, by the administrator, of any part of the estate which is committed to his charge, and the incapacity of the wife, even with the assent of the husband, to alienate her dotal property, or to become security for his debts. These take place only in the cases specially provided by law, under different titles of this Code."
[3] As amended effective January 1, 1980, Article 1790 provides:

"Besides the general incapacity that persons of certain descriptions are under, there are others applicable only to certain contracts, either in relation to the parties, such as tutor and ward, whose contracts with each other are forbidden; or in relation to the subject of the contracts, such as purchases, by the administrator, of any part of the estate committed to his charge. These take place only in the cases specially provided by law under different titles of this Code."